**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **BASE ACCESS, JEDD COWSER,** **LISA DEMUSIS, CATHERINE HANSEN,** **RYAN KEMPF, CHARLEY KURLINKUS,** **and MARSHALL MILLER,** | |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY** **AND INJUNCTIVE RELIEF** |
| v. | JURY TRIAL DEMANDED |
| **NATIONAL PARK SERVICE;** **JESSICA BOWRON,** Acting Director of the National Park Service, in her official capacity; **DEPARTMENT OF THE INTERIOR;** **DOUG BURGUM,** Secretary of the Department of the Interior, in his official capacity; **PAM BONDI,** Attorney General, in her official capacity, | Case No. 4:25-cv-790 |
| *Defendants*. | |

## INTRODUCTION

1.      This case is about fundamental freedom—freedom to engage in lawful recreation on public lands, freedom from arbitrary government overreach, and, above all, freedom from prosecution under criminal laws devised by unelected bureaucrats, rather than Congress.

2.      Plaintiffs in this action are American citizens, husbands, wives, parents, and working professionals—they are also disciplined athletes, part of a select group of BASE jumpers worldwide who, through courage, skill, and spirit of adventure, have experienced human flight in some of the most stunning natural landscapes on earth.  But should they ever BASE jump in the national parks, according to the National Park Service (NPS), they are also criminals.

3.      For decades, NPS, an executive-branch agency, has unconstitutionally wielded legislative power, criminalizing a vast range of conduct in America's 433 national parks.  As a

result, American citizens face federal misdemeanor charges for performing such unthinkable acts as: allowing a pet to "make noise that is unreasonable" (36 C.F.R. § 2.15(a)(4)); using or merely possessing a metal detector (36 C.F.R. § 2.1(a)(7)); or roller skating (36 C.F.R. § 2.20) in the national parks.

4.    NPS has also effectively criminalized an entire sport—BASE jumping—without direct congressional authorization, clear regulatory language, or a single assessment of whether BASE jumping could be permitted in any of the parks under regulated conditions. Plaintiffs face arrest and criminal penalties, including a fine of up to $5,000, federal probation, a permanent criminal record, and even imprisonment, for engaging in a legitimate, internationally recognized sport in the national parks, which hold many of the safest, most scenic places in the country for BASE jumping.

5.    At the heart of this case is a fundamental constitutional question: Can an executive agency, without clear direction from Congress, create and enforce criminal laws that deprive Americans of their liberties? The answer is unequivocally no.

6.    The Constitution vests legislative power solely in Congress. Yet here, NPS has unilaterally transformed a decades-old regulation that predates the existence of BASE jumping—36 C.F.R. § 2.17(a)(3), the "Aerial Delivery Rule"—into an outright prohibition of the sport. The Aerial Delivery Rule, originally issued to regulate aerial deliveries and cargo drops from aircraft, makes no mention of BASE jumping, nor, for that matter, any other recreational activity.

7.    To be clear, Congress has never criminalized the sport. Instead, Congress enacted the NPS Organic Act, 54 U.S.C. § 100101 *et seq.*, which conferred upon the Department of Interior (DOI) and its component agency NPS unfettered discretion to prescribe regulations deemed by the agencies to be "necessary or proper for the use and management" of the national parks. 54 U.S.C.

2

§ 100751(a). And through the criminal statute 18 U.S.C. § 1865(a), Congress vaguely mandated that the violation of any DOI or NPS regulation issued under the Organic Act—including those not yet in existence—would constitute a federal criminal offense. The Act contains no intelligible principle limiting DOI's authority to create criminal law. Instead, it provides only a vague mandate to "conserve" and "provide for the enjoyment" of national parks. 54 U.S.C. § 100101(a). As a result, NPS has seized on the Organic Act's nearly limitless mandate to criminalize countless forms of conduct that the nation's lawmaking officials never outlawed, in violation of the Constitution's Vesting Clause and fundamental principles of due process.

8.      The consequences are severe. Plaintiffs face criminal penalties, including prison time, for engaging in a recreational activity that NPS has unwaveringly refused to evaluate for its potential compatibility with park standards. Indeed, over the last forty years, NPS has denied every BASE jumping permit application except for one annual event at New River Gorge Bridge, while routinely granting permits for other extreme sports, such as hang gliding, rock climbing, and canyoneering. By selectively enforcing its aerial regulations against BASE jumpers while granting similarly situated recreationalists free access to the parks, NPS has abandoned reasoned decision-making in favor of arbitrary rule-by-decree.

9.      This lawsuit is not only about BASE jumping—it is about ensuring that federal government agencies remain within their constitutional bounds. The Organic Act provides no meaningful limits on NPS's authority to prescribe and enforce criminal regulations, leaving all American park-goers vulnerable to sweeping, agency-invented prohibitions, carrying the weight of criminal penalties. Unelected bureaucrats should not get to decide, at their discretion, what conduct constitutes a crime on 85 million acres of public land (nor on one acre of public land, for that matter). The Constitution does not permit such lawmaking by executive fiat.

10.     This Court should reaffirm the fundamental precepts that criminal laws must be written by Congress, not agencies, and that Americans are entitled to fair notice of what the law prohibits before they may be branded as criminals.  The Constitution demands nothing less.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and the Administrative Procedure Act.

12.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C).

13.     This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202. The Court may also compel or hold unlawful and set aside agency action pursuant to 5 U.S.C. § 706.

## PARTIES

14.     Plaintiff BASE Access is a 501(c)(3) nonprofit organization that advocates for the responsible practice of BASE jumping.  Founded in 2023, BASE Access was established to: (1) preserve BASE jumping access on public lands in the United States, (2) promote environmental stewardship within the BASE jumping community, (3) educate and represent thousands of BASE jumpers in collaboration with the government agencies that regulate public lands, and (4) decriminalize BASE jumping in the United States.  BASE Access currently has 110 members, at least one of whom resides within this district and at least 13 of whom are current or former United States military servicemembers who face an independent risk of prosecution by court-martial under the Uniform Code for Military Justice for violations of the Aerial Delivery Rule. *See* 10 U.S.C. § 934.  BASE Access's members, including its President, Brendan Weinstein, actively seek to legally BASE jump in national parks but are prevented from doing so as a result of NPS's

4

enforcement of the Aerial Delivery Rule, which ostensibly renders BASE jumping in the parks a criminal offense.

15.     Plaintiff Jedd Cowser is a product safety leader who leads quality control inspections to ensure public safety on elevators and escalators.  He has been BASE jumping since 2011 and resides in Magnolia, Texas.  Mr. Cowser is also a certified skydive instructor who teaches students to jump safely and responsibly.  Additionally, Mr. Cowser owns a wingsuit school in Houston, Texas, where he teaches experienced skydivers how to safely perform wingsuit jumps.[1] Mr. Cowser seeks to lawfully BASE jump in the national parks and to teach wingsuit jumping there, as many parks offer ideal conditions for beginners.

16.     Plaintiff Lisa DeMusis is a senior product manager and licensed skydiving instructor who resides in Longmont, Colorado.  Prior to her current career, Ms. DeMusis worked in software design for over a decade.  Following several years of experience in skydiving, Ms. DeMusis began taking BASE jumping courses in April 2024 in Twin Falls, Idaho,[2] where she trained in the mechanics, skills, and ethics of the sport, emphasizing safety and environmental responsibility.  Ms. DeMusis values meaningful mentorship opportunities and environmental consciousness within the BASE jumping community—qualities that she finds lacking in other, more popular outdoor activities.  Ms. DeMusis has found that BASE jumping can serve as a way to give back to local communities.  For instance, as she discovered, in Switzerland's Lauterbrunnen

---

[1] A wingsuit is a jumpsuit specially designed for skydiving and BASE jumping, which includes webbing between the arms and legs that increases lift and reduces descent speed, which allow athletes to convert vertical freefall into controlled horizontal flight.

[2] Perrine Bridge in Twin Falls, Idaho is one of the few bridges in the United States that is open to BASE jumpers all year.  As a result, there are a number of BASE jumping courses and academies available in Twin Falls.  *See* https://visitsouthidaho.com/adventure/base-jumping/.

Valley, BASE jumpers pay a fee that supports local farmers.[3]  Ms. DeMusis views BASE jumping as a challenging and rewarding sport that fosters self-discipline and courage, and which provides the unique opportunity to experience the magic of human flight while immersed in nature in some of the most beautiful places in the world.  Ms. DeMusis seeks to lawfully BASE jump in the national parks.

17.    Plaintiff Catherine Hansen is a skilled nurse and small business owner who resides in Moab, Utah.  She has competed both nationally and internationally in skydiving events, holds nine world records, and has been named national champion in a variety of advanced skydiving disciplines.  Ms. Hansen operates two businesses: Tandem BASE Moab, which offers guided BASE jumping experiences with certified instructors,[4] and Moab Oasis IV Hydration, which provides mobile IV therapy services.  She has been an active skydiver and BASE jumper for over twenty years, with years of experience working as an instructor of both sports.

18.    In September 2004, Ms. Hansen was arrested by an NPS ranger for BASE jumping in Yosemite National Park.  She was jailed overnight, charged by NPS with a violation of the Aerial Delivery Rule, sentenced to a three-year period of federal probation, fined approximately $1,500, and ordered to forfeit her BASE jumping gear.  Ms. Hansen seeks to lawfully BASE jump in the national parks.

19.    Plaintiff Ryan Kempf is a carpenter who resides in Longmont, Colorado.  He holds a master's degree in business and accounting and previously worked as a certified public accountant.  In addition to carpentry, Mr. Kempf owns and manages two rental properties.

---

[3] *Get Your Landing Card 2025*, Swiss Base Association, https://www.swissbaseassociation.org/landing-card (noting portion of landing card fees support farmers).

[4] Similar to tandem skydiving, tandem BASE jumping offers inexperienced individuals the opportunity to experience BASE jumping while remaining securely attached to a professional instructor during the course of the jump.

Mr. Kempf has been actively BASE jumping since 2018 and has completed hundreds of BASE jumps within the United States and internationally, including in Italy and Switzerland.

20.    On January 24, 2022, NPS charged Mr. Kempf with violating the Aerial Delivery Rule for BASE jumping in Yosemite National Park, accusing him of "[d]elivering a person by airborn[e] means."[5] Facing a maximum penalty of six months imprisonment, five years on federal probation, and a $5,000 fine, Mr. Kempf accepted a plea deal on May 15, 2024, resulting in a 7-day prison sentence. Mr. Kempf served his sentence in a California state prison alongside inmates convicted of homicide, arson, robbery, and assault. He seeks to lawfully BASE jump in the national parks.

21.    Plaintiff Charley Kurlinkus is an emergency room physician who resides in Sacramento, California. He has been a BASE jumper for nearly eighteen years and a skydiver for over twenty years. Dr. Kurlinkus has completed approximately 3,200 BASE jumps in around 26 countries. His experience includes international competitions, spectator events, and government demonstrations. For Dr. Kurlinkus, BASE jumping is about more than human flight. It is also about immersing himself in nature on a long, beautiful hike—before taking a "shortcut" back down. Dr. Kurlinkus seeks to lawfully BASE jump in the national parks.

22.    Plaintiff Marshall Miller is a dedicated father, a devout Mormon, and, for over two decades, has been a professional athlete in extreme sports, including skydiving, BASE jumping, paragliding, and wingsuit flying. He is also the co-founder and managing director of the GoPro Bomb Squad, which is comprised of professional athletes (including himself) who are sponsored

---

[5] Citation, *United States v. Kempf*, No. 6:22-PO-00063(E.D. Cal. Jan. 24, 2022) (ECF No. 1).

by GoPro to document aerial sports through the use of GoPro's products.[6]  GoPro has sponsored Mr. Miller since 2009 to travel the world and use GoPro's cameras to document his aerial feats, which include thousands of BASE jumps that he has lawfully performed across the world.  By sharing his experiences of human flight, Mr. Miller hopes to inspire others to pursue their passions and push the boundaries of what they believe is possible.

23.    In 2020, NPS charged Mr. Miller with two counts of Aerial Delivery Rule violations for BASE jumping in Zion National Park.  He was criminally fined $5,000 and was banned from Zion National Park for two years.  He was also admonished that any future violation of the regulation would result in imprisonment.  As a result of the criminal misdemeanor, Mr. Miller's helicopter license was revoked.  Mr. Miller seeks to lawfully BASE jump in the national parks.

24.    Defendant Doug Burgum is the Secretary of DOI, which is charged with managing the nation's federal lands and natural resources, including conditions on their access and use.  DOI is responsible for implementing the National Park Service Organic Act (the "Organic Act" or "Act"), 54 U.S.C. § 100101 *et seq*.  The Organic Act authorizes the Secretary to issue such regulations as he considers "necessary or proper for the use and management" of the national parks. 54 U.S.C. § 100751.  Anyone who violates a regulation authorized under 54 U.S.C. § 100751 faces criminal penalties.  *Id*.

25.    Defendant Jessica Bowron is the Acting Director of NPS, which is a component agency of DOI established under the Organic Act.  54 U.S.C. § 100301.  NPS is responsible for the supervision and management of the national parks of the United States.  54 U.S.C. § 100302.

---

[6] GoPro is an American technology company known for its "action cameras," which are highly durable and designed to be mounted or worn in such a way that they may capture the perspective of the user and shoot from an immersive, first-person vantage point.

In 1983, NPS adopted the current version of the regulations set forth in 36 C.F.R. § 2, including the Aerial Delivery Rule (36 C.F.R. § 2.17(a)(3)), which was issued under the authority of 54 U.S.C. § 100751.  NPS has criminally charged and prosecuted BASE jumpers, including some of the individual Plaintiffs, for ostensibly violating the Aerial Delivery Rule.

26.     Defendant Pam Bondi is the Attorney General of the United States and heads the U.S. Department of Justice, which is responsible for enforcing federal criminal law.  Defendant Bondi holds ultimate responsibility over decisions concerning whether and how to enforce federal criminal laws.

## FACTS OF THE CASE

### I.     STATUTORY AND REGULATORY FRAMEWORK

*A. The National Park Service Organic Act*

27.     In 1916, Congress enacted the Organic Act, 54 U.S.C. § 100101 *et seq.*, which formally established NPS as a federal agency within DOI.

28.     The Organic Act directs that:

The Secretary [of the Interior], acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a).

29.     The Act defines "National Park System" to mean "any area of land and water administered by the Secretary, acting through the [NPS] Director, for park, monument, historic, parkway, recreational, or other purposes." 54 U.S.C. § 100501.

30.     The National Park System currently includes 433 areas covering over 85 million acres within the United States and U.S. territories, which include national parks, battlefields, military parks, historical parks, lakeshores, seashores, recreation areas, rivers, and trails.[7]

31.     Under the Organic Act, the Secretary "shall prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units."  54 U.S.C. § 100751(a).  Any violation of a regulation prescribed under 54 U.S.C. § 100751(a) constitutes a federal criminal offense subject to a prison sentence of up to six months, a maximum fine of $5,000, and/or a term of federal probation of up to five years.  54 U.S.C. § 100751(c); 18 U.S.C. §§ 1865(a), 3559(a), 3561(c), 3571(b), and 3581(b).

32.     The Organic Act provides no further instruction, specifications, or limitations with respect to the scope of the Secretary's authority to promulgate criminal regulations that he deems "necessary or proper" under 54 U.S.C. § 100751(a).

33.     DOI has delegated much of its rulemaking authority under the Organic Act to NPS.  *See* DOI Departmental Manual (245 DM 1) § 1.1 (delegating NPS Director authority to issue rules and regulations that would amend by addition, revise, or revoke any regulations contained in Chapter 1, Title 36, Code of Federal Regulations and in Title 43, Code of Federal Regulations that relate to National Recreation Areas[8] or the National Park System).

34.     The Act separately provides that the Attorney General, upon request of the Secretary, may bring a civil enforcement action against "any person or instrumentality" for the "destruction, loss, or injury to a System unit resource" or to prevent such destruction, loss, or

---

[7] *Frequently Asked Questions*, National Park Service, https://www.nps.gov/aboutus/faqs.htm.

[8] National Recreation Areas are protected areas near large reservoirs, which "offer visitors a chance to experience water-based recreational activities," and which "often include important natural and cultural features."  *See America's Public Lands Explained*, U.S. Department of the Interior, https://www.doi.gov/blog/americas-public-lands-explained (archived content last accessed February 21, 2025).

injury.  54 U.S.C. § 100723(a).  Specifically, "any person that destroys, causes the loss of, or injures any System unit resource is liable to the United States for response costs and damages resulting from the destruction, loss, or injury."  54 U.S.C. § 100722(a).  Additionally, "[a]ny instrumentality, including a vessel, vehicle, aircraft, or other equipment, that destroys, causes the loss of, or injures any System unit resource shall be liable in rem to the United States for response costs and damages resulting from the destruction, loss, or injury to the same extent as a person is liable under subsection (a)."  54 U.S.C. § 100722(b).

35.    The Organic Act authorizes NPS to establish a fund to be used to "support projects and programs that enhance the visitor experience," including to "expand recreational opportunities and access to the public."[9]

36.    In its NPS appropriation requests for the Fiscal Year 2025, DOI allocated $299.5 million for "Visitor Services," intended to "expand access [to NPS public lands] for the benefit" of the millions of visitors who "seek[] inspiration and recreation" in the national parks.[10]

B.  *The Aerial Delivery Rule*

29.    In the early 1960s, the federal acquisition of private lands to create new park areas had become an important concern of NPS.[11]  Frequently, NPS clashed with private residents and other inholders who opposed the government's land acquisition efforts and refused to be bought out.  NPS was criticized for its "heavy-handed tactics" to compel owners to relinquish their

---

[9] *Budget Justifications and Performance Information Fiscal Year 2025, National Park Service*, U.S. Department of the Interior, at CCF-1, CC-5, https://www.doi.gov/sites/default/files/documents/2024-03/fy2025-508-nps-greenbook.pdf (requesting $13 million to be contributed to the NPS Centennial Challenge Fund in 2025); *see also* 54 U.S.C. § 103501 (establishing the National Park Centennial Challenge Fund).

[10] *Id*. at Overview-3, ONPS-41.

[11] PAUL D. BERKOWITZ, LEGACY OF THE YOSEMITE MAFIA 42 (1st ed. 2017).

properties, including, for example, refusing to plow town roads blanketed by a 40-inch snowfall after the town's residents had petitioned to secede from the park.[12]

30.     On information and belief, during that time, some park inholders relied on aerial deliveries of supplies and provisions when access to the main roads and towns was otherwise cut off.

31.     In 1965, NPS amended its "Aircraft" regulations to add 36 C.F.R. § 1.61(b), which provides: "Except in extreme emergencies involving the safety of human life or threat of serious property loss[,] no person or thing may be air delivered in the parks and monuments by parachute, helicopter, or other means without written permission of the [NPS] superintendent."  In its notice of Proposed Rulemaking, DOI justified the rule as necessary to "regulate dropping of cargo or persons in the national parks and monuments" by providing reasonable controls over "aerial delivery."  30 Fed. Reg. 1857 (Feb. 10, 1965).

32.     The 1965 regulation required that aerial delivery permit applicants inform the NPS superintendent of "the location at which the air delivery is proposed," as well as "the names of all persons involved in the combined ground and air operation."  36 C.F.R. § 1.61(b)(1).  It also specified that issuance of such permits would be based on factors, including "the availability of ground transport facilities as an alternative means of delivery."  36 C.F.R. § 1.61(b)(2).

33.     In 1983, NPS further revised and renumbered these regulations as 36 C.F.R. § 2.17(a)(3).  48 Fed. Reg. 30252, 30285 (June 30, 1983).  The 1983 version of the Aerial Delivery Rule remains operative today.

---

[12] *Id*. at 44.

34.     The Aerial Delivery Rule prohibits "[d]elivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit."  36 C.F.R. § 2.17(a)(3).

C. *NPS Management Policies*

35.     The NPS Management Policies (2006) provide internal guidance for NPS decision-making.[13]

36.     According to Section 8.2.2.7 of NPS's Management Policies, "[p]arachuting (or BASE jumping), whether from an aircraft, structure, or natural feature, is generally prohibited by 36 CFR 2.17(a)(3)," but "if determined through a park planning process to be an appropriate activity, it may be allowed pursuant to the terms and conditions of a permit."[14]

37.     The Aerial Delivery Rule does not require that a park planning process be conducted prior to a permit being granted.  On information and belief, nor did NPS's internal policies until the agency issued its most current Management Policies in 2006.

38.     NPS park planning ranges from broad general management plans to more specific implementation plans.[15]  Implementation planning processes focus on how to implement particular activities or projects, sometimes requiring an environmental impact analysis, as required under the National Environmental Policy Act (NEPA), to evaluate whether an activity would adversely affect a park's wildlife, natural resources, or historic sites.[16]

---

[13] NPS Management Policies (2006), https://www.nps.gov/subjects/policy/upload/MP_2006.pdf.

[14] *Id.* ¶ 8.2.2.7 (2006).

[15] *Id.* ¶ 2.3 (2006).

[16] *Id.* ¶¶ 2.3.4 and 2.3.4.1 (2006).

39.    Section 8.1.1 of the NPS Management Policies states that NPS will only allow recreational activities in the parks that are "(1) appropriate to the purpose for which the park was established, and (2) can be sustained without causing unacceptable impacts."[17]

40.    Section 8.2.2 of the NPS Management Policies provides that the determination of whether a particular recreational activity is appropriate must be made "on the basis of park-specific planning."[18]

41.    Section 8.2.2.1 of the NPS Management Policies requires that park superintendents develop and implement park plans to evaluate particular recreational activities to ensure that such activities "do not cause unacceptable impacts on park resources or values."[19]

42.    Section 1.4.6 of the NPS Management Policies describes "park resources and values" as:

a.    The park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;

b.    Appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;

c.    The park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and

---

[17] *Id.* ¶ 8.1.1 (2006).

[18] *Id.* ¶ 8.2.2 (2006).

[19] *Id.* ¶ 8.2.2 (2006).

d.  [A]ny additional attributes encompassed by the specific values and purposes for which the park was established.[20]

43.    The NPS Management Policies provide that, in addition to BASE jumping, certain other recreational activities are "generally prohibited" in the national parks pursuant to an NPS-issued regulation, but that such activities may be permitted after a park planning process is conducted.

44.    For instance, the NPS Management Policies provide that "[p]ersonal watercraft use is generally prohibited by 36 CFR 3.24," but that the activity "may be allowed within a park by special regulation if it has first been determined through park planning to be an appropriate use that will not result in unacceptable impacts."[21]

45.    NPS has undertaken park planning processes regarding the use of personal watercraft in at least fifteen NPS park units, notwithstanding the 36 C.F.R. § 3.24's general prohibition.[22]

46.    NPS has never initiated or conducted a "park planning process" to determine whether BASE jumping is an "appropriate" activity pursuant to its Management Policies.

47.    NPS has denied virtually all BASE jumping permit requests.[23]

---

[20] *Id.* ¶ 1.4.6 (2006).

[21] *Id.* ¶ 8.2.2.3 (2006).

[22] *Taking on Water: The National Park Service's Rulemaking Effort on Personal Watercraft: Hearing Before the H. Subcomm. on Regulatory Affairs, H. Comm. on Gov. Reform*, 109 Cong. 16 (2006), https://www.doi.gov/ocl/personal-watercraft.

[23] Since 1980, NPS has made a single exception to its ban on BASE jumping. With the support and encouragement of the local community and officials, NPS has permitted BASE jumpers to legally jump once per year from the New River Gorge Bridge on West Virginia's "Bridge Day," currently West Virginia's largest single-day, annual festival and one of the largest extreme sports events in the world.  Over the last 45 years, thousands of BASE jumps have been safely executed on Bridge Day.  On information and belief, NPS was required to issue a special use permit for BASE jumping on Bridge Day as a condition for the establishment of New River Gorge National Park.  Prior to the area's designation as a national park and reserve in 2020, pursuant to the New River Gorge National Park and Preserve Designation Act, NPS managed only the New River Gorge National River, which was established as a national river in 1978.  For purposes of Bridge Day, only the river and riverbank landing areas fall within NPS jurisdiction, whereas the bridge itself was (and remains) owned by the West Virginia Department of Transportation.  Recognizing that a prohibition on BASE jumping on Bridge Day would severely impact one of the state's largest festivals—a significant

## II.    THE NATIONAL PARK SERVICE'S CRIMINALIZATION OF BASE JUMPING

### A.  Origin of BASE Jumping

48.    The modern sport of BASE jumping was born in the United States in 1978 when California cinematographer and skydiver Carl Boenish, along with his wife and two other skydivers, filmed the world's first BASE jumps using ram-air parachutes from the nearly 3,000-foot-high summit of El Capitan in Yosemite National Park.[24]   Boenish coined the acronym "BASE," which stands for Building, Antenna (*i.e.*, tower), Span (*i.e.*, bridge), and Earth (*i.e.*, cliff).

49.    Boenish's 1978 film captivated the public and demonstrated that BASE jumping is neither an inherently reckless act nor an irrational pursuit of danger.  Instead, he showed BASE jumping to be a skill-based, legitimate sport that is accessible to experienced skydivers with the proper training.[25]

50.    At its core, BASE jumping is an extreme sport in which a parachutist leaps from a fixed structure or natural feature and deploys a specially designed parachute to control descent—sometimes also incorporating the use of a wingsuit.  Since its inception in the late-1970s, BASE jumping has evolved significantly, driven by advancements in equipment, training, and safety protocols, all of which have helped contribute to its worldwide recognition as a legitimate extreme sport.

---

source of revenue for local businesses—on information and belief, the creation of New River Gorge National Park and Reserve was conditioned on NPS's agreement to permit BASE jumping on Bridge Day.

[24] *See BASE Jumping: How It Began*, Bridge Day (Oct. 16, 2009), https://officialbridgeday.com/bridge-blog/base-jumping-how-it-began; *see also* Thom Patterson, *Meet the father of BASE jumping*, CNN (Jan. 15, 2016), https://www.cnn.com/2016/01/14/us/sunshine-superman-carl-boenish-base-jumping/index.html; *BASE Jumping*, Time (Oct. 17, 2008), https://time.com/archive/6913533/base-jumping/.

[25] *BASE Jumping: How It Began*, *supra* note 24.

51.     For example, the "ram-air" parachutes used by Boenish's group in 1978 had never before been used for BASE jumping.  Today, they are standard among BASE jumpers due to their advanced maneuverability and precise steering and landing capabilities.[26]

52.     In the early days of the sport, BASE jumpers had to use modified skydiving equipment, which was not designed to address the unique challenges of fixed-object jumps. Modern BASE jumpers benefit from advancements in technology and purpose-built equipment, including specialized parachutes, wingsuits optimized for rapid deployment at lower altitudes and greater control during descent, and sophisticated simulation software to predict a flight path and avoid obstacles—a critical consideration in low altitude jumps.[27]  These advancements have increased safety and enabled jumpers to exercise significantly more control during a jump.[28]

53.     Deployment in BASE jumping relies on a highly specialized system that consists of: the canopy (the parachute); a harness/container (the bag resembling a backpack worn by the BASE jumper, in which the canopy is stored); and the pilot chute (a small parachute that is deployed first, the drag of which pulls the canopy out of the container by a long cord, known as a bridle).  As BASE jumping has gained in popularity, the BASE jumping community has amassed extensive knowledge and best practices on deployment, refining techniques to maximize safety, reliability, and ethical considerations.[29]

---

[26] Unlike traditional round parachutes, which are primarily used as drag devices to slow descent, ram-air parachutes function as a non-rigid, inflatable wing designed to provide lift and enable precise control in direction and landing. *See* Skydive Fundamentals, *Ram-air parachutes: how they fly and how we can describe them*, YouTube (Oct. 19, 2022), https://www.youtube.com/watch?v=1p_Mmj4fZ-s&ab_channel=SkydiveFundamentals.

[27] *See* BASEline, https://baseline.ws/; BaseBeta, https://apps.apple.com/us/app/basebeta/id1212178753; Skyderby, https://skyderby.ru/.

[28] *BASE Jumping: How It Began*, *supra* note 24.

[29] MATT GERDES, THE GREAT BOOK OF BASE (3d ed. 2018).

54.    Across the country, structured training programs provide comprehensive instruction on the skills necessary to responsibly BASE jump, including proper jumping techniques, gear inspection, rigging, and maintenance, weather assessment, object avoidance, landing accuracy, and progression into more advanced types of jumps.[30]  The courses universally emphasize safety and ethics, and frequently require a student to have strong experience in skydiving (typically, at least 150-200 skydives) prior to BASE jump training.[31]

55.    Today, BASE jumping is recognized across the world as a standalone sport with its own guidelines, events, and a thriving equipment and training industry.  Each jump is the result of considerable training and planning.[32]

*B.  BASE Jumping in National Parks*

56.    Many of the safest and most scenic places to BASE jump in the world are located in the national parks managed by NPS.[33]

57.    Yosemite National Park, for instance, offers ideal conditions due to its many large, sheer walls, which afford a jumper more time to deploy his parachute from a higher altitude;  level cliff ledges at 90-degree angles, which reduce the risk of slipping into an uncontrolled jump;  stable high-pressure weather systems, which minimize turbulence and unpredictable wind shifts; and  soft landing zones, including grass, dirt, and sand, which reduce the risk of injury upon landing.

---

[30] *See, e.g.*, The Bob's BASE Academy, https://bobsbase.com/courses/base-jumping/first-base-jump-course/; Next Level BASE, https://nextlevel.ws/courses/base-training; Snake River BASE Academy, https://www.snakeriverbase.com/courses; BASE Spirit, https://www.basejumpspirit.com/en/faq-base-jumping/#learning-base-jumping; Learn to BASE Jump, https://www.learntobasejump.com/.

[31] BASE jumpers must be able to control body position and tracking during a descent to ensure proper canopy deployment and to execute precise maneuvers to land in a targeted landing spot.  Skydiving from an aircraft, which provides a longer period of time in freefall and thus allows for a larger margin of error, allows would-be BASE jumpers to practice these skills from a significantly greater altitude than a BASE jump.

[32] *See* MATT GERDES, *supra* note 29.

[33] *See* Cally Carswell, *Deaths renew calls for national parks to rescind BASE jumping bans*, HighCountryNews (July 20, 2015), https://www.hcn.org/issues/47-12/deaths-renew-calls-for-national-parks-to-rescind-base-jumping-bans/.

58.     In 1980, recognizing burgeoning interest in the emerging sport, NPS established a trial permit program for BASE jumping in Yosemite National Park, which required prospective El Capitan jumpers to submit a written application and meet certain other criteria.

59.     Although there were no fatalities or major injuries during the Yosemite trial period, NPS abruptly terminated the program after approximately two months. The agency cited violations of permit conditions, minor injuries, and unpermitted jumps as justification for the shutdown.[34]

60.     In a sworn affidavit, former NPS ranger Carol Moses stated that, after NPS terminated the permit program in Yosemite, then-NPS Chief Ranger Bill Wendt instructed the rangers to arrest all BASE jumpers.[35]

61.     In her affidavit, Moses states that, although rock climbing and BASE jumping posed the same logistical issues concerning safety and the gathering of spectators, NPS allowed rock climbing to freely take place in the park because the rangers sometimes needed the climbers' skills for search and rescue operations.[36]

62.     According to Moses, who served as an NPS ranger from 1974-1992, then-Chief Ranger Wendt made it clear to the rest of the rangers that he disliked BASE jumpers.[37]  During one of the rangers' morning briefings, Wendt explained to the other rangers that he did not believe BASE jumping was an appropriate activity and that, unlike rock climbers (who Wendt also disliked), BASE jumpers served no "useful purpose."[38]

---

[34] *See* Ed Scott, *A Jump Story*, Parachutist (Apr. 1, 2017), https://parachutist.com/Article/a-jump-story.

[35] Carol Moses, Affidavit ¶ 10, *United States v. Nunn*, No. 6:20-PO-00742 (E.D. Cal. Feb. 27, 2023), https://baseaccess.s3.us-west-1.amazonaws.com/USAvNUNN/org/10.+Reply+to+Government's+opposition+to+evidentiary+hearing+with+exhibits+2023.03.08+%5BDkt.+%23+52%5D.pdf.

[36] *Id*. ¶ 9.

[37] *Id*. ¶ 11.

[38] *Id*.

63.     In her affidavit, Moses describes how the NPS rangers formed a special BASE jumping patrol to arrest BASE jumpers called SPLATT (an acronym for "Stop Parachutists Leap At The Top"), which created its own "SPLATT Team" t-shirts.[39]  According to Moses, the patrol would often engage in subterfuge, posing as hikers to try to catch BASE jumpers at the top of the cliffs before they jumped, which sometimes endangered both the jumper and the ranger.[40]

64.     In connection with NPS's termination of the Yosemite permit program in 1980, then-Chief Ranger Bill Wendt stated in the 2014 film *Sunshine Superman* (a documentary that depicts the life and death of Carl Boenish) that the ban was necessary because "[t]here were just too many free spirits, and we had to shut [BASE jumping] down."[41]

### C.  NPS's Criminalization of BASE Jumping

65.     Since terminating its Yosemite trial program in 1980, NPS has enforced a strict ban on BASE jumping, criminalizing the sport in virtually all NPS-controlled national parks for nearly half a century.

66.     Congress has never directly outlawed or otherwise criminalized BASE jumping in the national parks (nor anywhere else).

67.     NPS has never issued a regulation—as opposed to internal guidance (*i.e.*, NPS Management Policy ¶ 8.2.2.7)—that explicitly names or regulates BASE jumping.

68.     Despite this, NPS has consistently criminally prosecuted BASE jumpers— including three of the individual Plaintiffs—over the last four decades for their purported violations of the Aerial Delivery Rule, which prohibits "[d]elivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public

---

[39] *Id*. at ¶ 13.

[40] *Id*.

[41] *See* Carswell, *supra* note 33.

safety or serious property loss, or pursuant to the terms and conditions of a permit." 36 C.F.R. § 2.17(a)(3).

69.     In the forty-five years since BASE jumping's inception, NPS has denied every BASE jumping permit request in all but one national park. The sole exception is New River Gorge Park where, with the support and encouragement of the local community and elected officials, NPS has permitted BASE jumpers to legally jump once per year from the New River Gorge Bridge on West Virginia's "Bridge Day," currently West Virginia's largest single-day, annual festival and one of the largest extreme sports events in the world.[42]  Since the first official Bridge Day in 1980, thousands of BASE jumps have been safely executed on Bridge Day.

70.     By contrast, the Federal Bureau of Land Management (BLM), another DOI agency, allows BASE jumping to take place without a permit year-round on its federal lands, so long as BASE jumpers adhere to a short set of rules, including not to land on the roads, not to park or drive off-road, and to leave no waste or litter on the public lands.[43]

71.     In 2015, the head of BLM's Moab field office described BASE jumpers as light on the land, noting that they seldom provoke conflict and remain small in number.[44]

72.     However, due to the significantly lower cliffs and rocky, boulder-strewn landing areas, BASE jumping on BLM lands is substantially more dangerous than in the national parks.[45]

73.      NPS's refusal to issue permits (other than Bridge Day) or otherwise allow the recreational activity is groundless and discriminatory.

---

[42] *See New River Gorge Bridge*, National Park Service, https://www.nps.gov/neri/planyourvisit/nrgbridge.htm.

[43] *BLM Utah Recreation*, Bureau of Land Management, https://www.blm.gov/programs/recreation/recreation-activities/utah.

[44] Carswell, *supra* note 33.

[45] Alison Brooke Rubenstein, *"The Whole World Is Jumpable", Except for the National Parks*, 8 U. Balt. J. Envtl. L. 150, 171 n. 129 (2001).

74.     NPS's absolute ban and strict criminal enforcement of BASE jumping is also a contributing factor in many of the fatalities related to BASE jumping in the national parks.[46][47]

75.     It is widely understood within the BASE community that NPS will never grant a permit application for BASE jumping in the national parks and will instead arrest and pursue severe criminal penalties against BASE jumpers, including imprisonment.[48]

76.     This understanding has driven some BASE jumpers to take unnecessary risks and jump under suboptimal conditions to avoid detection, including jumping before dawn or after dusk when visibility is limited.   To prevent their expensive equipment from being confiscated, they sometimes use old or unfamiliar gear—further increasing the risk of accidents.[49]

77.     NPS regularly permits numerous other extreme recreational activities to take place in the national parks, including those which pose higher risks of environmental impact or disruption than BASE jumping.[50]   Those activities include backcountry skiing, snowmobiling, off-road mountain biking and vehicle use, backcountry hiking, rock climbing (including big-wall

---

[46] *See* Carswell, *supra* note 33.

[47] In June 2001, 28-year-old Frank Gambalie, an experienced BASE jumper considered one of the best in the world, was chased to his death by NPS rangers after he jumped before dawn from the summit of El Capitan in Yosemite National Park.   After safely landing, the rangers converged from two directions on Gambalie who fled and, in his effort to escape, drowned while attempting to swim across the Merced River.   *See* Janet Reitman, *Last base*, ESPN (July 10, 2012), https://www.espn.com/espn/story/_/page/Mag15lastbase/frank-gambalie-lived-died-base-jumping-espn-magazine-archives.

[48] In October 2011, for example, Ammon McNeely was sentenced to a 20-day term of imprisonment for purportedly violating the Aerial Delivery Rule after BASE jumping in Yosemite National Park.   After serving 29 days of his 20-day sentence, Mr. McNeely's federal public defender moved for his release, citing his imprisonment beyond the term of the sentence.   NPS's Acting Legal Officer opposed the motion to release.   Ultimately, the court ordered Mr. McNeely released after serving a 33-day term of imprisonment.   *See generally*, *United States v. McNeely*, No. 6:11-mj-00141-MJS (E.D. Cal.).   When NPS rangers arrested him, Mr. McNeely describes how the rangers tased him, shooting "50,000 volts right in the back of the neck."   *See* Valley Uprising 1:22:42 (2014).

[49] In 1999, 60-year-old Jan Davis died after BASE jumping in Yosemite National Park while using borrowed equipment, with which she was unfamiliar, so that her own equipment would not be confiscated by NPS rangers waiting to arrest her.   *See* Associated Press, *Parachutist Dies in Fall at Yosemite's El Capital*, L.A. Times Archive (Oct. 23, 1999), https://www.latimes.com/archives/la-xpm-1999-oct-23-mn-25364-story.html.

[50] *See* Rubenstein, *"The Whole World Is Jumpable", Except for the National Parks*, 8 U. BALT. J. ENVTL. L. at 171-72.

climbing, which sometimes requires climbers to sleep while attached overnight to a vertical cliff wall), and canyoneering (considered "extreme hiking," which combines hiking, rappelling, swimming, rope climbing up steep mountain walls, and squeezing through tight crevices).[51]

78.     According to NPS's compilation of mortality data between 2007 through 2024,[52] in the over 433 national parks combined, there were the following total fatalities for each activity:

  a.  Hiking: 502
  b.  Swimming: 447
  c.  Climbing: 149
  d.  Biking: 64
  e.  Camping: 42
  f.  Photographing (including, "selfie deaths"[53]): 27
  g.  Skiing: 23
  h.  Canyoneering: 20
  i.  BASE jumping: 8 (and zero fatalities since 2017)

79.     NPS also allows hang gliding to take place in the national parks under a permit system, despite its classification as an extreme aerial sport substantially similar to BASE jumping.[54]

80.     Hang gliding involves jumping from a cliff or mountain ledge while hanging from a harness under a large, unpowered, kitelike wing weighing up to 80 pounds.

81.     In its final publication of the Aerial Delivery Rule in 1983, NPS noted that it had received "78 comments citing the inappropriateness of hang gliding in park areas," and that only

---

[51] *Id*.    *See also, Backcountry Climbing and Mountaineering*, National Park Service, https://www.nps.gov/dena/planyourvisit/backcountryclimbing.htm.

[52] https://www.nps.gov/aboutus/mortality-data.htm.

[53] *See National Park Service brings attention to taking safe selfies*, CBS News (April 9, 2019), https://www.cbs58.com/news/national-park-service-brings-attention-to-taking-safe-selfies; *see also* Pesala Bandara, *Photography is The Most Lethal Activity at Grand Canyon National Park*, Peta Pixel (Aug. 15, 2024), https://petapixel.com/2024/08/15/photography-is-the-most-lethal-activity-at-grand-canyon-national-park/.

[54] According to former-NPS ranger Carol Moses, when she and other members of NPS's "BASE Jump Patrol" would apprehend BASE jumpers, the jumpers frequently pointed out that there was no permit system to jump lawfully, whereas hang gliding, a substantially similar activity, was permitted.  According to Moses, many of the initial issues that arose under Yosemite's trial permit program for BASE jumping in 1980 could have been managed had a better permit system been in place, similar to the hang gliding permit system.  Moses Affidavit, *supra* note 35 ¶¶ 14-15.

two commenters supported the activity. 48 Fed. Reg. 30258 (June 30, 1983). NPS further acknowledged that "the [hang gliding] launching and landing sites may require protection from overuse," and that there was a "known potential" for hang gliding to "interfere with other activities." *Id*. NPS reassured the public that, with respect to activities regulated by 36 C.F.R. § 2.17, NPS "will be consistent in its approach to authorizing special uses in park areas," such as special use permits.

82.     Despite its express acknowledgement of the risks that hang gliding poses to the environment within the national parks, NPS routinely grants special use permits to hang gliders.

83.     In January 2021, for example, when NPS granted the Yosemite Hang Gliding Association a permit to conduct hang gliding activities in the park, NPS acknowledged the activity's potential risks, including disruption of peregrine nesting areas, impact or harm to sensitive vegetation and wildlife upon landing in sufficiently large designated areas, human safety, and damage to protected wetlands and meadows.[55] NPS nevertheless granted the permit so long as certain conditions were met (*e.g.*, maximum number of launches per day, avoiding the same landing spot each day).[56]

84.     On information and belief, NPS park rangers have participated in hang gliding programs in the national parks.

85.     On information and belief, NPS has consistently granted special use permits for hang gliding in the national parks, including Yosemite National Park, Golden Gate National Recreation Area, and Shenandoah National Park.

---

[55] Letter of Compliance Completion from Ruth Middlecamp, Project Manager, Yosemite National Park to Cicely Muldoon, Superintendent, Yosemite National Park (Jan. 15, 2021), https://baseaccess.s3.us-west-1.amazonaws.com/parkPlanning/hanggliding-checklist.pdf.

[56] *Id*.

86.     By contrast, NPS has consistently denied special use permits for BASE jumpers.

87.     On information and belief, NPS has never criminally prosecuted a hang glider for hang gliding in a national park.

### D. Efforts to Decriminalize BASE Jumping

88.     Over the last two decades, as BASE jumping has gained popularity and legitimacy, the BASE jumping community has consistently sought to engage in dialogue with NPS officials in an effort to legalize the sport through a permit system or other reasonable compromise.

89.      Certain members of Congress have also taken an interest in NPS's categorical ban on BASE jumping in all but one of the over 433 national parks.

90.     In a series of letters sent between 2002-2004, then-U.S. Representative Thomas Tancredo wrote to NPS to propose a permitting system for BASE jumping in NPS park units.[57]

91.     On July 1, 2004, NPS's then-Assistant Secretary for Policy, Management, and Budget P. Lynn Scarlett responded, citing "unpleasant past experiences" from Yosemite's trial program in 1980 as a key reason for the continued prohibition.[58]  Scarlett stated that, while BASE jumping is prohibited by the Aerial Delivery Rule, NPS could waive the rule at its discretion, as it had done for Bridge Day at New River Gorge National Park.[59]

92.     In the letter, Scarlett said that the parks could not initiate permit programs for BASE jumping without conducting a planning process, and she encouraged the BASE jumping community to "involve themselves in the planning process that takes place at each park[.]"[60]

---

[57] See Letter from P. Lynn Scarlett, Assistant Secretary – Policy Management and Budget, Department of the Interior to Hon. Thomas G. Tancredo (July 1, 2004), https://www.nps.gov/subjects/policy/upload/BASE_Letter.pdf.

[58] Id. at 1.

[59] Id. at 2.

[60] Id. at 3.

93.     Scarlett closed her correspondence with the entreaty that "[NPS] hope[s] that members of the parachuting community will avail themselves of the many opportunities that the parks offer for involving them in the planning and decision-making process."[61]

94.     Since the 2004 letter exchange, despite ongoing engagement efforts from the BASE jumping community, NPS has not conducted a single planning process to assess whether to permit BASE jumping in any national park.  Nor has NPS granted a single permit request for BASE jumping in any national parks.

95.     Over the last two years, Plaintiff BASE Access has made numerous and ongoing efforts to engage NPS officials and park superintendents to determine how the BASE jumping community may involve itself in the park planning processes, and what steps might be taken to legalize BASE jumping, including by obtaining special use permits.[62]

96.     NPS Policy requires that a superintendent's decision to approve or deny a special use permit "must be based on consideration of relevant factors related to the request," and that the decision "should articulate a rational connection between the facts and the final decision."[63]

97.     On February 22, 2023, BASE Access drafted a proposal for regulated BASE jumping in Yosemite National Park, including specific ways to ensure minimal impact to the environment, reduce accident risk, and minimize the chance of disrupting park operations, while providing BASE jumpers with a legal means of jumping in the park.[64]

---

[61] *Id.*

[62] NPS issues special use permits to authorize a wide range of activities that are planned by individuals, organizations, or businesses.  Superintendents use such permits to "minimize unacceptable impacts to park resources and values, avoid potential conflicts between disparate park uses, and ensure visitor safety."  *Special Use Permits – 08-02-12*, U.S. Department of the Interior, https://www.doi.gov/ocl/hearings/112/Special-Use-Permits-08-02-12.

[63] NPS Director's Order No. 53, § 2; *see also* RM-53 SPECIAL PARK USES, Ch. 8, at C8-1 (*"The decision to approve or deny a special park use should be based on objective data and recorded in the administrative record."*).

[64] *Yosemite Proposal*, BASE Access, https://baseaccess.s3.us-west-1.amazonaws.com/YosemiteProposal.pdf.

98.     On May 10, 2023, BASE Access's President, Brendan Weinstein, sent a letter, along with the Yosemite Proposal, to NPS requesting a meeting to discuss ways in which BASE Access and the BASE jumping community could work with NPS to ensure safe, responsible BASE jumping in the national parks.  BASE Access also sent the letter and proposal to Bob Ratcliffe, who, as of December 7, 2023, was listed as NPS's Division Chief of Conservation and Outdoor Recreation.  Neither NPS nor Bob Ratcliffe responded to this letter.

99.     On December 7, 2023, BASE Access emailed a copy of the Yosemite Proposal to NPS employee Krista Sherwood.

100.    On December 12, 2023, BASE Access emailed NPS officials Jesse McGahey and Cicely Muldoon to request a meeting to discuss the ways in which BASE jumping might be permitted in Yosemite National Park.[65]  Neither official responded.

101.    On December 12, 2023, BASE Access President Weinstein applied for a special use permit to wingsuit BASE jump in Yosemite National Park in January 2024.[66]  Mr. Weinstein included a supplement to the permit application, which introduced BASE Access and its goals, and which supplied detailed information concerning the proposed BASE jump.[67]

102.    On January 2, 2024, BASE Access sent a follow-up email to NPS officials McGahey and Muldoon, concerning the prior December 12, 2023 email.  Neither official responded.

---

[65]  Email from Brendan Weinstein to Jesse McGahey (Dec. 12, 2023), https://baseaccess.s3.us-west-1.amazonaws.com/outreach/Dec12-YosemiteOutreach.pdf.

[66]  *Application for Special Use Permit*, BASE Access, https://baseaccess.s3.us-west-1.amazonaws.com/permitApplications/finalDraft-yosemite-template.pdf.

[67]  *Special Use Permit Application for Wingsuit BASE jumping in Yosemite National Park*, BASE Access (Dec. 11, 2023), https://baseaccess.s3.us-west-1.amazonaws.com/permitApplications/finalDraft-yosemite-extended.pdf.

103.    On January 9, 2024, NPS formally denied Mr. Weinstein's application, stating that NPS must conduct a "park planning process" to determine whether BASE jumping is an appropriate activity at Yosemite National Park, and that Yosemite National Park does not have the capacity to conduct such a study.[68]

104.    On February 8, 2024, NPS Associate Director William Shott issued a Guidance Memorandum (the "Shott Memo") with the subject "Managing BASE Jumping" to all NPS Associate and Assistant Directors and Regional Directors.[69]    The Shott Memo stated: "NPS is issuing guidance reaffirming NPS regulations and policies about how BASE jumping should be managed," in response to several requests for information that NPS had received concerning BASE jumping, including the agency's permit program for BASE jumping.[70]

105.    The Shott Memo states that, "although there are no NPS regulations that specifically address BASE jumping, the NPS has a specific policy for BASE jumping in section 8.2.2.7 of NPS *Management Policies* (2006)," which provides that BASE jumping is generally prohibited, but may be allowed by permit, "but only after it is determined to be an appropriate activity through a park planning process."[71]

106.    The Shott Memo instructs all NPS Superintendents to "neither approve nor deny applications for BASE jumping" if the park's "planning process has not been completed."[72]

---

[68]    Letter from Joseph Meyer to Brendan Weinstein (Jan. 9, 2024), https://baseaccess.s3.us-west-1.amazonaws.com/permitApplications/2024-01-09+BASE+Access+Response.pdf.

[69]    Memorandum from Associate Director (A), Visitor and Resource Protection William Shott to Associate and Assistant Directors and Regional Directors, https://www.nps.gov/subjects/policy/upload/NPS_Guidance_Memo_BASE_Jumping.pdf.

[70]    *Id.*; NPS Management Policies, § 8.2.2.7 (2006).

[71]    *Id.*

[72]    *Id.*

107.    At that time, on information and belief, no NPS-managed national park had completed, or even initiated, a park planning process for BASE jumping.

108.    The Shott Memo attached a template for superintendents to use as a de facto denial of BASE jumping permit applications, instructing that Superintendents should simply "acknowledge receipt of the application and state that it cannot be considered because the system unit has not completed the required planning process."[73]

109.    Following the issuance of the Shott Memo, BASE Access received verbatim responses from the Superintendents of Grand Teton, Grand Canyon, Northern Cascades, Guadalupe, Big Bend, Kings Canyon, Glen Canyon, and Glacier National Parks concerning the BASE jumping applications that it had submitted.  In each case, the response used the de facto denial template appended to the Shott Memo.  BASE Access attempted to contact the Superintendent's office of each park to schedule a call to discuss some means of legally BASE jumping, but with the exception of Northern Cascades National Park, each Superintendent ignored the outreach.

110.    On April 12, 2024, Base Access's General Counsel, Kendrick Dane, submitted an appeal of Yosemite National Park's January 9, 2024 denial of Mr. Weinstein's special use permit application, which detailed decades of futile engagement efforts by the BASE and parachute community.[74]

111.    On July 24, 2024, NPS returned Mr. Weinstein's $100 fee submitted with his December 12, 2023 special use permit application without explanation.

---

[73] *Id.*

[74] Letter from Kendrick W. Dane to Cicely Muldoon (Apr. 12, 2024), https://baseaccess.s3.us-west-1.amazonaws.com/permitApplications/2024-april-finalAppealWithExhibits.pdf.

112.    Assuming a clerical error, Mr. Weinstein resubmitted the check on August 1, 2024, explaining that BASE Access was still waiting for NPS's response to the administrative appeal submitted on April 12, 2024, and reiterating BASE Access's willingness to meet with Yosemite officials.  No response was received.

113.    On August 8, 2024, NPS denied BASE Access's administrative appeal, stating that there is no formal administrative appeal process.  NPS also stated that permits are only available if a park has undertaken a "planning process" to determine a permit's availability, which, of course, none of the parks had undertaken.[75]

114.    In addition to Yosemite National Park, BASE Access has submitted permit applications to BASE jump in several other NPS-managed parks.  All have been denied:[76]

    a.    Yosemite National Park: **Permit denied January 9, 2024**

    b.    Zion National Park: **Permit denied February 7, 2024**

    c.    Grand Teton National Park: **Permit denied February 15, 2024**

    d.    Grand Canyon National Park: **Permit denied February 23, 2024**

    e.    Guadalupe National Park: **Permit denied February 23, 2024**

    f.    Northern Cascades National Park: **Permit denied February 23, 2024**

    g.    Big Bend National Park: **Permit denied March 8, 2024**

    h.    Kings Canyon National Park: **Permit denied April 2, 2024**

    i.    Glen Canyon National Park: **Permit denied April 25, 2024**

    j.    Glacier National Park: **Permit denied August 1, 2024**

---

[75] Letter from David Szymanski to Kendrick W. Dane (Aug. 8, 2024), https://baseaccess.s3.us-west-1.amazonaws.com/permitApplications/yoseAppealDenial.pdf.

[76] Each application and NPS denial are available at http://baseaccess.org/outreach.

115.    On August 1, 2024, BASE Access emailed an NPS official to inquire about Glacier National Park's permit process.  On August 5, 2024, NPS responded that "there is no permit process available for BASE jumping."[77]

116.    To date, NPS has refused to engage in any meaningful discussions about a potential permitting system.

E.    *Impact on Plaintiffs*

117.    NPS's criminal enforcement of the Aerial Delivery Rule—the origin and history of which predates the existence of BASE jumping by nearly two decades—is not only a matter of arbitrary and capricious policy, but also a violation of Plaintiffs' constitutional rights.

118.    Under the Fifth Amendment, it is unconstitutional for any American citizen to face criminal penalties under a statute that fails to provide fair notice of what conduct is prohibited, thereby encouraging arbitrary and discriminatory enforcement.  Yet that is precisely the case here. Neither the NPS Organic Act nor the Aerial Delivery Rule prohibits BASE jumping, nor provides reasonable notice that the recreational activity of BASE jumping is a *criminal* offense.

119.    By its plain terms, the Aerial Delivery Rule regulates the unauthorized dropping of cargo and persons from aircraft—not the recreational act of human flight using wingsuits and/or specialized, ram-air parachutes.  Moreover, the Aerial Delivery Rule regulates the *delivery* of cargo and persons into the national parks.  There is no delivery when a person moves himself from one location in a park to another location in the same park.  NPS has nevertheless weaponized an unrelated rule to impose severe criminal penalties on BASE jumpers like Plaintiffs, three of whom

---

[77] Email from Special Park Uses Office, Glacier National Park to Brendan Weinstein (Aug. 5, 2024), https://baseaccess.s3.us-west-1.amazonaws.com/outreach/2024-August5-GlacierStatesNoPermitProcessExists.pdf.

have already been arrested, fined, sentenced to federal probation, and even imprisoned—all for engaging in a sport that Congress has never criminalized.

120.    NPS's criminalization of BASE jumping in national parks also harms those Plaintiffs who have not yet been charged, but who seek to lawfully participate in the sport in the national parks.  They are forced to choose between compliance and criminal liability, as BASE jumping in the safest and most scenic locations in the country remains subject to federal prosecution.

121.    NPS's selective enforcement of the Aerial Delivery Rule against BASE jumpers further underscores the arbitrary and unconstitutional nature of its actions.  Indeed, for decades, hang gliding has been allowed in multiple national parks through a regulated permit system, despite presenting many of the same safety and logistical considerations as BASE jumping.  NPS also permits numerous other extreme sports and more environmentally impactful activities than BASE jumping, including backcountry skiing, rock climbing, and canyoneering.  Yet BASE jumpers have been categorically denied the opportunity to obtain permits.  Agency officials may not pick and choose which recreational activities are permissible under the law on the basis of bureaucratic bias, rather than reasoned decision-making or congressional action.

122.    The Constitution vests legislative power solely in the legislative branch.  Yet BASE jumpers face criminal prosecution not because Congress enacted a law proscribing their sport in national parks, but because unelected officials in an executive agency have arbitrarily applied an expansive interpretation of a decades-old regulation to modern-day BASE jumping—an interpretation that is reflected nowhere in the rule's text or regulatory history.  The result is an unconstitutional exercise of legislative power by the executive branch, which deprives Plaintiffs

of due process and the right to engage in otherwise legal recreation on equal footing with other outdoor enthusiasts—and without facing prison time and a permanent criminal record.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE VESTING CLAUSE, ART. 1 SEC. 1 OF THE UNITED STATES CONSTITUTION

123.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

124.    Pursuant to Article I, § 1 of the U.S. Constitution, "[a]ll legislative powers herein granted shall be vested in a Congress of the United States."  Only Congress may engage in lawmaking.  "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  The prohibition against the divestment of legislative power is not only necessary to protect one branch of government from intrusions by another, but "[t]he structural principles secured by the separation of powers protect the individual as well."  *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 55 (2015) (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)). Individuals have a right to be subject to laws enacted by their elected representatives in Congress. That right is violated when unelected executive branch officials effectively enact legislation via regulation.

125.    While Congress may delegate limited authority, the statutory delegation must include intelligible principles to which the delegatee "is directed to conform."  *Consumers' Research v. FCC*, 109 F.4th 743, 759 (5th Cir. 2024) (quoting *J.W. Hampton, Jr., & Co v. United States*, 276 U.S. 394, 409 (1928)).

126.    There are, for good reason, "limits of delegation which there is no constitutional authority to transcend."  *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 430 (1935).  It is not enough for

Congress to set out "aspirational" principles, rather than "inexorable statutory command[s]." *Consumers' Research*, 109 F.4th at 760; *see also id.* at 761 (agencies may not "roam at will").

127.    Indeed, it would "frustrate the system of government ordained by the Constitution if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." *Consumers' Research*, 109 F.4th at 759-60 (citing *Gundy v. United States*, 588 U.S. 128, 153 (2019) (Gorsuch, J., dissenting)).

128.    When Congress broadly delegates its legislative power, the people can no longer "readily identify the source of legislation or regulation that affects their lives." *Ass'n of Am. R.Rs.*, 575 U.S. at 57 (Alito, J., concurring).  That, in turn, allows "[g]overnment officials [to] wield power without owning up to the consequences." *Id*.  *See also Gonzales v. Oregon*, 546 U.S. 243, 262-63 (2006) (an agency may not seize, nor be delegated, the unbounded power to decide whether to criminalize physician-assisted suicide).

129.    Vested Powers inquiries "always begin[ ] ... with statutory interpretation" because the constitutional question is whether Congress has supplied a sufficiently intelligible principle to guide an agency's discretion. *Consumers' Research*, 109 F.4th at 759; *see also Touby v. United States*, 500 U.S. 160, 165-66 (1991) (cleaned up) (suggesting that "something more than an intelligible principle" may be required when Congress authorizes another branch to promulgate regulations enforced by criminal sanctions).  Accordingly, courts must construe a challenged law to determine "what task it delegates and what instructions it provides." *Consumers' Research*, 109 F.4th at 760 (quoting *Gundy*, 588 U.S. at 135).

130.    In enacting the NPS Organic Act, Congress conferred unfettered discretion on the Secretary of DOI to "prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units," 54 U.S.C. § 100751(a), offering as guidance only a

34

vague mandate to "conserve" and "provide for the enjoyment" of national parks.  54 U.S.C. § 100101(a).

131.    Congress then criminalized whatever conduct might fall within those capacious and amorphous ideals.  Indeed, 18 U.S.C. § 1865(a) provides, with no further guidance or limitation, that the violation of *any* regulation the Secretary deems "necessary or proper" under the statute constitutes a federal criminal offense subject to a prison sentence of up to six months, a maximum fine of $5,000, and a term of federal probation of up to five years.  *See also* 54 U.S.C. § 100751(c); 18 U.S.C. §§ 3559(a), 3561(c), 3571(b), and 3581(b).

132.    The Organic Act contains no intelligible principle limiting DOI's authority to create criminal law.[78]

133.    As a result, DOI and NPS have seized on the Organic Act's nearly limitless mandate to criminalize a vast range of conduct, including: the use or mere possession of a metal detector (36 C.F.R. § 2.1(a)(7)); fishing without the rod or line being closely attended (36 C.F.R. § 2.3(d)(1)); accidentally leaving trash behind at a campsite (36 C.F.R. § 2.10(b)(2)); unauthorized

---

[78] In *United States v. Grimaud*, 220 U.S. 506 (1911), the Supreme Court upheld Congress's delegation of authority to the Secretary of Agriculture to promulgate a criminal regulation prohibiting the unauthorized grazing of livestock on national forest reservations.  The delegation at issue in that case, however, is distinguishable from the NPS Organic Act's unfettered delegation of authority to the Secretary to prescribe law that he deems "necessary or proper" to "conserve" and "provide for the enjoyment" of national parks.  In *Grimaud*, Congress had established the reservations to protect the forests within from destruction or depredation, and, to ensure that the statute was carried into effect, Congress authorized the Secretary to issue regulations to "protect[] against destruction by fire and depredations upon the public forests and forest reservations" and to "preserve the forests thereon from destruction."  *Id*. at 509.  The Supreme Court concluded that Congress had not delegated open-ended authority to make "rules and regulations for any and every purpose" (which would not have been permissible), but instead had authorized the Secretary only to "fill up the details" necessary to administer the law within clearly defined statutory parameters.  *Id*. at 517-522.  The key principle in *Grimaud* was that Congress, itself, made the fundamental policy decisions and then provided clear guidance for the executive's enforcement of the law.  *Id*. at 522.  The Secretary's authority was limited and tethered to "defined" subjects (*i.e.*, the protection of forest reserves from "depredations and from harmful uses"), which were "clearly indicated and authorized by Congress."  *Id*.  By contrast, the NPS Organic Act offers no meaningful guidance or limitations on the Secretary's vague and capacious authority to issue such criminal regulations "as [he] considers necessary or proper for the use and management" of the national parks.  54 U.S.C. § 100751(a).

collecting of seashells (36 C.F.R. § 2.1(c)(1)); allowing a pet to "make noise that is unreasonable" (36 C.F.R. § 2.15(a)(4)); using roller skates or skateboards (36 C.F.R. § 2.20)).

134.     The Act's vague, "aspirational" mandate permits DOI and NPS to "roam at will" in determining what conduct qualifies as a criminal act within the 85 million acres of NPS-controlled land within the United States.

135.     By omitting an intelligible principle from the Organic Act, Congress has enabled Defendants, at their own discretion, to invent a virtually limitless series of criminal regulations, which each carry the weight of a potential six-month term of imprisonment, a $5,000 fine, federal probation, and a permanent criminal record.  Such an open-ended delegation of criminal law-making authority permits unchecked intrusions on individual liberty and violates the Constitution's core principles of due process and the separation-of-powers.

136.     The NPS Organic Act, in conjunction with 18 U.S.C. § 1865(a), unconstitutionally delegates legislative power to make criminal law and thus violates the Vesting Clause of the United States Constitution.  The Aerial Delivery Rule, used to criminalize BASE jumping, derives from this unconstitutional delegation—yet Congress has never outlawed BASE jumping.

## COUNT TWO—VIOLATION OF THE FIFTH AMENDMENT
### (Due Process)

137.     Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

138.     The Fifth Amendment prohibits the "depriv[ation] of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Government violates this guarantee of due process "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it

invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citation omitted).

139.    "Vague congressional delegations undermine representative government because they give unelected bureaucrats—rather than elected representatives—the final say over matters that affect the lives, liberty, and property of Americans." *Consumers' Research*, 109 F.4th at 759. Further, the vagueness doctrine "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions" of those who enforce the law. *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018).

140.    Indeed, in our constitutional order, "a vague law is no law at all." *United States v. Davis*, 588. U.S. 445, 447 (2019). Only Congress can write new federal criminal laws, and "when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them." *Id*. at 448. When Congress passes a vague law, neither the executive nor judicial branch may "fashion a new, clearer law to take its place." *Id*. Instead, the reviewing court must "treat the law as a nullity and invite Congress to try again." *Id*.

141.    A law is impermissibly vague if it fails to give fair notice—to both defendant and enforcer—of the conduct that it prohibits. *Johnson v. United States*, 576 U.S. 591, 596-97 (2015).

142.    Criminal law, in particular, must be stated "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted).

143.    Indeed, it has long been settled that "penal statutes are to be construed strictly," and one may not "be subjected to a penalty unless the words of the statute plainly impose it." *United States v. Campos-Serrano*, 404 U.S. 293, 297 (1971) (citations omitted). It therefore follows that

a criminal law may not be read expansively to include what is not within its plain language. *Kordel v. United States*, 335 U.S. 345, 348-49 (1948).

144.    The "most meaningful aspect of the vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to govern law enforcement" to prevent "arbitrary and discriminatory enforcement." *Smith v. Goguen*, 415 U.S. 566, 573-74 (1974). And where Congress fails to provide such minimal guidelines, a criminal law may permit "a standardless sweep [that] allows [enforcers] to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (quoting *Smith*, 415 U.S. at 575). Vague criminal regulations present the same due process concerns. *See United States v. Batson*, 706 F.2d 657, 679 (5th Cir. 1983) ("A statute which is so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process … This rule applies to regulations.").

145.    The NPS Organic Act, in conjunction with 18 U.S.C. § 1865(a), is impermissibly vague because it fails to define what conduct is criminal, providing no clear guidelines for enforcement. Instead, the Organic Act permits a "standardless sweep" that authorizes DOI and NPS to criminalize, in the agencies' unfettered discretion, activities, including BASE jumping, by inventing "necessary or proper" regulations that carry criminal penalties.

146.    The Aerial Delivery Rule, as applied to BASE jumping, is also impermissibly vague. The regulation prohibits "delivering or retrieving a person or object by parachute, helicopter, or other airborne means." 36 C.F.R. § 2.17(a)(3). Yet the rule does not define "deliver"—a term that ordinarily connotes handing over or conveying something from one person to another, as opposed to voluntarily jumping and landing elsewhere, *infra* Count Three—and, thus, fails to provide "fair notice of the conduct it punishes" (namely, BASE jumping). *Johnson*, 576 U.S. at 595. Instead, NPS's construction of the Aerial Delivery Rule leaves "men of common

intelligence" to "guess at its meaning and differ as to its application," in plain violation of the vagueness doctrine. *Batson*, 706 F.2d at 679 (quoting *Connally v. Gen. Construction Co.*, 269 U.S. 385, 391 (1926)).

147.    As a result, Plaintiffs face the threat of a six-month prison sentence, a $5,000 fine, federal probation, and a permanent criminal record—all without clear notice of what the law demands.

148.    This Court must, therefore, declare that the Aerial Delivery Rule, 54 U.S.C. § 100751(c) and 18 U.S.C. § 1865(a)—the statutory provisions that authorize criminal prosecution and penalties for violations of regulations that NPS deems "necessary or proper"—are unconstitutionally vague and unenforceable, and should "invite Congress to try again." *Davis*, 588 U.S. at 448.

COUNT THREE – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

149.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

150.    Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "(B) contrary to constitutional right[,]" or "(C) in excess of statutory jurisdiction, authority, or limitations…"   5 U.S.C. § 706(2)(A)-(C).

151.    The APA ensures judicial review of agency decisions and mandates that agencies engage in reasoned decision-making. *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993); *Texas v. United States*, 524 F. Supp. 3d 598, 652 (S.D. Tex. 2021).

152.    In determining whether an agency decision was arbitrary and capricious, the reviewing court "must consider whether the decision was based on a consideration of the relevant

factors." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  An agency decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

153.    An "[u]nexplained inconsistency" in agency policy is also a reason for holding that agency action is arbitrary and capricious.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

154.    Whether agency action is "final" and thus reviewable under the APA is a "flexible" and "pragmatic" inquiry.  *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967)).  Agency action is "final" where (1) it "mark[s] the consummation of the agency's decisionmaking process," and (2) it is action by which "rights or obligations have been determined," or "from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up).

155.    Agency "inaction may represent effectively final agency action that the agency has not frankly acknowledged."  *The Queen ex rel. Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990).  When agency inaction "has the same impact on the rights of the parties as an express denial of relief, judicial review is not precluded" under the APA.  *Id.*  Similarly, the absence of a formal statement of an agency's position is not dispositive.  *Id.*  (An agency may not avoid judicial review "merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation.");  *see also Nat'l Pork Producers Council v. U.S. E.P.A.*, 635 F.3d 738,

755 (5th Cir. 2011) (guidance letters can constitute final agency action because they "serve[d] to confirm a definitive position that has a direct and immediate impact on the parties") (citing *The Queen ex rel. Ontario*, 912 F.2d at 1532).

156.    An agency cannot shield final agency action from judicial review under the APA by labeling it as "under consideration," "interim," or "temporary." *See Texas v. United States*, 555 F. Supp.3d 351, 389-90 (S.D. Tex. 2021).  This is particularly true when the agency action "has an immediate and definite nature," from which "legal consequences will flow."  *Id*. at 390 (citing *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 596-97 (2016)).

157.    Defendants' conduct alleged herein constitutes "final agency action" that is contrary to law.

158.    *First*, Defendants' construction of the Aerial Delivery Rule to encompass BASE jumping is incorrect, unreasonable, arbitrary, and capricious.[79]

159.    The regulation prohibits "delivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss."  36 C.F.R. § 2.17(a)(3).  The ordinary meaning of the term "deliver" is to "take and hand over to," to "leave for another,"[80] or to "give, transfer, yield possession or control."[81]  Indeed, the word "delivery" connotes handing over something from one person to another—not jumping voluntarily and landing elsewhere.  BASE jumping does not involve the "delivery" of a person or object and does not fall within the regulation's scope.

---

[79] As detailed above, *supra* Count Two, NPS's construction of the Aerial Delivery Rule is also contrary to Plaintiffs' constitutional right to due process under the Fifth Amendment.

[80] *Deliver*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/deliver (last visited Feb. 21, 2025).

[81] *Deliver*, WEBSTERS THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 597 (1971).

160.    NPS's contrary interpretation of "delivery" is not entitled to any judicial deference because the Aerial Delivery Rule is not genuinely ambiguous.  *See Kisor v. Wilkie*, 588 U.S. 558 (2019).  Deference is further inappropriate because the regulation carries criminal penalties. *Cargill v. Garland*, 57 F.4th 447, 466 (5th Cir. 2023) (en banc), *aff'd*, 602 U.S. 406 (2024).

161.    The Aerial Delivery Rule's regulatory history confirms that its purpose is to govern cargo drops and emergency evacuations, not recreational activities.  30 Fed. Reg. 1857 (Feb. 10, 1965).

162.    NPS's interpretation of the Aerial Delivery Rule "runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, and NPS has failed to provide a reasoned explanation for why BASE jumping falls within the regulatory ambit of a rule designed for aerial cargo operations, which predates the existence of BASE jumping.  This is textbook arbitrary and capricious agency action.

163.    Moreover, even if the Organic Act's broad and amorphous mandate to "conserve" and "provide for the enjoyment of" the national parks qualified as an "intelligible principle" (it does not), NPS's construction of the Aerial Delivery Rule exceeds the scope of the statute.  Indeed, rather than provide for enjoyment, NPS has outlawed a form of recreational enjoyment that the agency has not shown to impede the conservation of the national parks.

164.    *Second*, Defendants' categorical refusal to permit BASE jumpers to lawfully jump in the national parks—or even to initiate an assessment of BASE jumping to determine whether it might be compatible with park standards and values—is arbitrary and capricious.

165.    For over 40 years, NPS has categorically refused to permit BASE jumping in national parks, denying all permit applications except for one annual event at New River Gorge.

166.    Meanwhile, NPS permits hang gliding and other extreme sports that present comparable safety and environmental concerns.  Yet BASE jumping alone remains universally prohibited.

167.    NPS has offered no rational justification for this differing treatment.  Instead, it refuses to engage in any process to assess whether BASE jumping could be permitted under regulated conditions.  And it uses its own refusal as an insurmountable procedural barrier to permit applications.

168.    NPS's own policy requires a park planning process before BASE jumping can be permitted, yet NPS has refused to initiate such a process—effectively creating a perpetual ban without justification.

169.    The February 8, 2024 Guidance Memorandum issued by NPS Associate Director William Shott instructs all superintendents to neither approve nor deny BASE jumping applications until a planning process is complete.  However, NPS has made clear that it has no intention of conducting this process, ensuring that the ban remains indefinitely.

170.    Plaintiffs have repeatedly applied for BASE jumping permits at multiple parks, only to receive blanket denials without substantive review.[82]

171.    NPS's continued refusal to consider whether BASE jumping should be permitted constitutes final agency action that is arbitrary, capricious, and unlawful under the APA.  This Court should set aside NPS's categorical ban on BASE jumping and require the agency to engage in reasoned decision-making, consistent with the APA.

---

[82] *E.g.*, Email from NPS Visitor Service Manager of Guadalupe National Park to BASE Access President, Brendan Weinstein (March 15, 2024) ("We cannot consider requests for BASE jumping, since we have not yet completed the required planning process for Guadalupe Mountains National Park.  Therefore, we cannot approve nor deny requests for BASE jumping at this time.  Dialogue concerning the matter will not begin until the planning process is completed."), https://baseaccess.s3.us-west-1.amazonaws.com/permitApplications/2024-March15-KafkaesqueGuada lupeEmail.pdf.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.      Declare that the Organic Act unconstitutionally delegates legislative power to DOI and NPS in violation of the Vesting Clause of the United States Constitution;

B.      Declare that the Organic Act and 18 U.S.C. § 1865(a) violate the nondelegation doctrine for providing no intelligible principle to guide or limit DOI and NPS's authority to enact criminal laws;

C.      Declare that 54 U.S.C. § 100751(c), 18 U.S.C. § 1865(a), and the Aerial Delivery Rule are void for vagueness, as applied to BASE jumping, in violation of the Fifth Amendment;

D.      Declare that NPS's interpretation and enforcement of the Aerial Delivery Rule is arbitrary and capricious, contrary to Plaintiffs' constitutional rights, in excess of statutory authority, and otherwise not in accordance with law, in violation of the APA and is therefore unlawful and invalid;

E.      Enjoin Defendants, as well as their officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), from attempting to impose criminal penalties against BASE jumpers who allegedly violate the Aerial Delivery Rule;

F.      Nominal damages of $1 each; and

G.      Any other relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

February 24, 2025

Respectfully submitted,

/s/ Casey Norman
Casey Norman
Litigation Counsel
New York Bar # 5772199
SDTX # 3845489
Casey.Norman@ncla.legal
Attorney-in-Charge

/s/ Sheng Li
Sheng Li*
Litigation Counsel
New York Bar # 5448147
Sheng.Li@ncla.legal
* Pro Hac Vice Motion Forthcoming

NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210

*Counsel for All Plaintiffs*

/s/ Adam Adler
Adam Adler*
New York Bar # 5470174
E-mail: aadler@reichmanjorgensen.com
* Pro Hac Vice Motion Forthcoming

REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1909 K St., NW Suite 800
Washington, DC 20006
Telephone: (202) 894-7312

*Counsel for Plaintiff BASE Access*

45