IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BASE ACCESS, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL PARK SERVICE, et al., <br><br> *Defendants*. | Case No. 4:25-cv-790 |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
SUPPLEMENTAL BRIEF**

Plaintiffs respectfully submit this response to Defendants' supplemental brief, ECF 34, which purports to describe the process by which a BASE jumping permit may be sought in the national parks, as well as the process by which a citizen may initiate the rulemaking process to amend regulations pertinent to this action. *See* ECF 31.

Plaintiffs address below the factual inaccuracies and legal deficiencies raised in Defendants' supplemental brief. Even so, the governing standard at this juncture in the proceeding warrants primary emphasis. At the pleading stage, Plaintiffs are not required to prove the merits of their claims, marshal evidence, or negate Defendants' alternative narratives about how the regulatory scheme supposedly operates. Instead, when standing is challenged, "the court must 'accept as true all material allegations of the complaint and ... construe the complaint in favor of the complaining party.'" *Petteway v. Galveston Cnty.*, 666 F. Supp. 3d 655, 664 (S.D. Tex. 2023) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010)). A Rule 12(b)(1) motion to dismiss

1

for lack of subject matter jurisdiction should be granted "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle [him] to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A similar principle governs Defendants' venue and Rule 12(b)(6) arguments: all well-pleaded allegations must be accepted as true, all factual conflicts resolved in Plaintiffs' favor, and the complaint need only state a plausible claim for relief. *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Plaintiffs have more than satisfied their threshold burden.

## I. NPS's Purported Permit Process is a Futile and Discriminatory Facade That Amounts to a Categorical Ban of BASE Jumping

Defendants' assertion that BASE jumping is legal in the national parks, so long as a permit is obtained rests on a circular and pretextual premise: that permits may only be issued after NPS completes a "park planning process" to determine whether BASE jumping is an "appropriate activity" in a given park. *See* ECF 34 at 1-2 ("Supp. Brief"). Yet NPS's own public statements belie the notion that the agency actually regards BASE jumping as "legal with a permit," as agency officials have repeatedly described BASE jumping as "illegal in all national parks"—without qualification and without reference to the existence of any permit process.[1] As the Complaint describes (and Defendants do not dispute),

---

[1] *See* Owen Clarke, "BASE Jumpers Took an Illegal Leap in Yosemite During the Government Shutdown," Outside Magazine (Oct. 13, 2025), https://tinyurl.com/4f9694cy (NPS official stating that "BASE jumping is illegal in all national parks"); *see also* Yosemite National Park Service (@YosemiteNPS), X (Oct. 31, 2025), https://tinyurl.com/59j9fsnj ("The @NatlParkService would like to remind all visitors that parachuting, paragliding, or BASE jumping within national park boundaries is illegal."). Courts may take judicial notice of an agency's public statements. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (court "appropriately used judicial notice" of "publicly-available documents … which were matters of public record directly relevant to the issue at hand"); *see also Hawaii v. Trump*, 859 F.3d 741, 773 n.1 (9th Cir.) (taking judicial notice of tweets), *vacated on other grounds*, *Trump v. Hawaii*, 583 U.S. 941 (2017).

2

Defendants have categorically refused to initiate the requisite park planning process, thus necessitating the automatic denial of BASE jumping permit requests. Indeed, in the nearly 50 years since BASE jumping's inception, NPS has never once undertaken such a planning process to assess whether the activity could be permitted in any unit of the National Park System. *See* ECF 1, ¶¶ 46, 168. Over that same span, NPS has denied every BASE jumping permit request across the park system—save for a single, anomalous exception. The lone exception is New River Gorge Park, where BASE jumping is permitted from a single location on a single day each year during West Virginia's annual "Bridge Day" festival. *See* ECF ¶ 8. As detailed in the Complaint, NPS's accommodation of Bridge Day was not the product of any park planning process or substantive evaluation of BASE jumping's suitability in the national parks. *See* ECF 1 at 15 n.23. Rather, it arose from unique political and jurisdictional circumstances: namely, West Virginia retained control of the New River Gorge Bridge and conditioned its consent to the designation of New River Gorge as a national park and preserve on NPS's agreement to permit BASE jumping on Bridge Day. *See id*. NPS's one-time political concession to allow BASE jumping on a single day at a single park does not convert an otherwise categorical ban into a viable permit process—not even with respect to New River Gorge Park where BASE jumping remains criminally banned 364 days of the year.

  Critically, Defendants' focus on the Aerial Delivery Rule's purported "permit requirement" does not defeat, or even meaningfully bear on, Plaintiffs' standing, because the Rule does not prohibit—or apply in any manner to—BASE jumping. *See* 36 C.F.R. § 2.17(a)(3). Plaintiffs do not claim to be injured by the denial of BASE jumping permits

3

under a valid regulatory scheme, but by NPS's continuing enforcement of an inapplicable regulation to impose criminal penalties for conduct that Congress never prohibited (and that NPS has purportedly criminalized only through the NPS Organic Act's unconstitutional delegation of lawmaking authority, *see* 54 U.S.C. § 100751).

By its plain terms, the Rule regulates the unauthorized dropping of cargo and persons from aircraft—not the recreational act of human flight using wingsuits and/or specialized, ram-air parachutes. Moreover, the Aerial Delivery Rule regulates the *delivery* of cargo and persons into the national parks—but there is no "delivery" when a person moves himself from one location in a park to another location in the same park. And as the Complaint explains, the Aerial Delivery Rule's regulatory history confirms that its purpose is to govern aerial cargo drops and emergency deliveries, not recreational activities. *See* ECF 1 ¶¶ 29-34, 161. NPS has nevertheless weaponized this unrelated regulation to impose severe criminal penalties on BASE jumpers like Plaintiffs, three of whom have already been arrested, fined, sentenced to federal probation, and even imprisoned—all for engaging in a sport that Congress never criminalized. As the Complaint alleges, NPS has never issued a regulation that specifically names or regulates BASE jumping. ECF 1 ¶ 67; *see also id*. ¶ 105 (NPS February 8, 2024 Guidance Memorandum explicitly stating that "there are no NPS regulations that specifically address BASE jumping"). Instead, the agency has retrofitted an inapplicable regulation to criminalize an activity that falls well beyond the

4

regulation's scope—thus, evading the procedural and substantive requirements of APA rulemaking, including public notice and comment.[2]

Even if the Aerial Delivery Rule's permit requirement applied to BASE jumping (it does not), the Complaint makes clear that no meaningful permitting pathway exists. For years, as BASE jumping has gained in popularity and legitimacy, the BASE jumping community, including BASE Access, has made repeated efforts to engage NPS officials in dialogue to discuss means by which BASE jumping might be legalized through a permit system or other reasonable compromise. *See, e.g.*, ECF 1 ¶¶ 88-102; *id*. ¶ 97 (describing BASE Access's proposed regulatory framework for regulated BASE jumping in the national parks—sent to various NPS officials—including specific ways to ensure minimal impact to the environment, reduce accident risk, and minimize the chance of disrupting park operations, while providing BASE jumpers with a legal means of jumping in the park). Those efforts have been met only with silence, deflection, or categorical refusal. As

---

[2] Even assuming *arguendo* that the Aerial Delivery Rule governs BASE jumping, nothing in the Rule's text mandates the completion of a park planning process before a permit may issue. Nor does NEPA require full-scale environmental review for low-impact park activities. *See* Council on Environmental Quality, "A Citizen's Guide to the NEPA," 10-11 (Dec. 2007), https://tinyurl.com/yt6cp282. To the contrary, the agency has long recognized that such activities may qualify for "categorical exclusions" (CEs) where no significant environmental impact is likely. Indeed, over a decade ago, NPS determined that hang gliding qualified for a CE, thus excluding the activity from further NEPA analysis. *See* NPS Categorical Exclusion Form (March 26, 2013), https://tinyurl.com/4zuzzzmh. Notably, for years prior to NPS's CE determination in 2013, NPS nonetheless routinely granted permits for hang gliding in the parks. *See id*. at 2 ("Hang gliding in the park was originally conducted in cooperation with Yosemite National Park Rangers who both participated in and managed the program prior to 1992. Beginning in 1992 the Yosemite Hang Gliding Association began managing the program under permit from the park.").

NPS has likewise demonstrated its ability to waive internal guidance and permit requirements, including through Director's Orders, such as Director's Order 41 (deeming rock climbing a "legitimate and appropriate" activity that generally does not require a permit). *See* NPS Director's Order #41, https://tinyurl.com/5y59ma8b; *see also* Letter from P. Lynn Scarlett, Assistant Secretary – Policy Management and Budget, Department of the Interior to Hon. Thomas G. Tancredo (July 1, 2004), https://www.nps.gov/subjects/policy/upload/BASE_Letter.pdf (NPS official informing then-U.S. Representative Thomas Tancredo that the Aerial Delivery Rule "may be waived" and that it "was indeed waived in the case of Bridge Day" at New River Gorge Park.).

detailed in the Complaint, NPS has repeatedly declined to review applications or engage in substantive discussion, instead invoking the absence of a park-level planning process that the agency has never initiated and has made clear it does not intend to pursue. *See* ECF 1 ¶¶ 98-116. Indeed, NPS's February 8, 2024 Guidance Memorandum on "Managing BASE Jumping" expressly directs all park superintendents to "neither approve nor deny applications for BASE jumping" if the park's "planning process has not been completed." *See* ECF 1 at 28-29.

By conditioning permit consideration on a planning process that the agency has never initiated—and has affirmatively declined to initiate for decades—NPS has erected a self-reinforcing barrier to participation. That is not a process, but a pretext.

Further, NPS's longstanding and permissive treatment of other comparable activities in the parks underscores that Plaintiffs' injuries do not stem from any inherent unworkability of permit processes for extreme recreational activities, but from the agency's deliberate refusal to extend such permitting mechanisms to BASE jumping. As detailed in the Complaint, ECF 1 ¶¶ 79-87, 121, NPS has routinely permitted hang gliding in national parks for decades, despite NPS's acknowledgement of its potential risks to human safety and environmental impact. Other extreme recreational activities—including backcountry skiing, snowmobiling, offroad mountain biking and vehicle use, backcountry hiking, rock climbing—are likewise permitted in the national parks. *See* ECF 1 ¶¶ 77-78. Notably, even "free soloing," which involves climbing without ropes or safety equipment—other than, in

6

some cases,[3] a *parachute* in case of an unexpected fall—requires no permit whatsoever. Nor do most other forms of rock climbing, despite presenting risks and logistical challenges on par with, or greater than, those associated with BASE jumping.

Ultimately, the insurmountable procedural barrier that NPS has erected does not constitute a meaningful permit process for BASE jumpers. This Court should reject Defendants' efforts to recast a categorical criminal ban as a functional permit program— one that, in reality, offers no realistic path to lawful BASE jumping in the national parks.

**II.     The Petition Process Does Not Provide a Mechanism Equivalent to Direct Judicial Review**

Section 553(e) of the Administrative Procedure Act ("APA") provides that agencies "shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). While the APA creates a statutory right to petition, it places no specific obligations on agencies to act on the petitions they receive. *Id.* Nor does it place an obligation on regulated parties to file a petition prior to seeking direct review. *Id.* Stated another way, failure to file a petition for review is not a barrier to directly challenging a regulation as Plaintiffs have done here.

There are several reasons why pursuing a petition for review rather than a direct challenge is suboptimal. *First*, agencies can and often do delay resolving petitions, which can lead to ancillary litigation burdening both the petitioners and the courts. The agencies'

---

[3] To Plaintiffs' knowledge, free soloing with a parachute (commonly referred to as "free BASEing") is permissible in the national parks without a permit—so long as the climber does not deploy the parachute. According to NPS, it is thus lawful and "appropriate" for a rock climber to ascend a sheer cliff face without ropes, harnesses, or any safety equipment, accepting the possibility of a fatal fall, yet it is a criminal offense for that same climber to deploy a parachute to avoid death or serious injury.

7

processes to review, consider, and respond to § 553(e) petitions that they receive are not widely known or understood outside the agencies themselves. The most recent comprehensive study of how agencies handle petitions is nearly a decade old but indicates that, at most agencies, the process is opaque at best. *See generally* Jason A. Schwartz and Richard L. Revesz, *Petitions for Rulemaking, Final Report to the Administrative Conference of the United States* (Nov. 5, 2014), https://www.acus.gov/projects/petitions-rulemaking ("ACUS Report"). Some agencies, like NPS, have adopted minimal procedures governing the receipt of and response to petitions. *See* 43 C.F.R. part 14. Even though NPS's procedures require "prompt consideration" of the petitions that it receives, the regulations do not define what that means or how it differs from the APA's "unreasonable delay[]" standard for agency actions.

 Agencies may, and often do, sit on petitions for rulemaking notwithstanding the APA's command that agency action is not "unreasonably delayed." 5 U.S.C. § 706(1). And how long a delay must last to become "unreasonable" is entirely unpredictable. As the ACUS Report highlights, a court found that five months was unreasonable when the agency had been studying the issue for two years. ACUS Report at 15 (discussing *Public Citizen v. Heckler*, 602 F. Supp. 611, 613 (D.D.C. 1985)). Meanwhile, another court found a 20-month delay "disturbing," but not unreasonable. *Id.* (discussing *Nat'l Tank Truck Carriers, Inc. v. Fed. Highway Admin.*, No. 96-1339, 1997 WL 150088 (D.C. Cir. Feb. 27, 1997) (per curiam)). One court found a delay of more than six years "nothing less than egregious," while a different court ruled that an equally long delay was reasonable. *Id.* at 16 (discussing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004), and *Oil,*

*Chem. & Atomic Workers Union v. Occupational Safety & Health Admin.*, 145 F.3d 120, 124 (3d Cir. 1998)). Thus, petitioning for review or amendment of a regulation may take longer than direct review and require additional ancillary litigation to compel an agency to act on a petition.

*Second*, review from denial of a § 553(e) petition is not equivalent to the direct judicial review that Plaintiffs seek through this litigation. The standard of review of an agency's decision to deny a petition is limited and deferential, and denials are virtually never overturned. *See* ACUS Report at 18. "[R]efusals to institute rulemaking proceedings" are subject to an "extremely limited, highly deferential scope of ... review." *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989). That is because "[courts] will overturn an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency." *Id.* at 96-97. And "it is only in the rarest and most compelling of circumstances that [courts have] acted to overturn an agency judgment not to institute rulemaking." *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981). The government has admitted as much in other cases. *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 25 (2019) (Kavanaugh, J., concurring in the judgment). Indeed, in each of the cases that Defendants cite in their Supplemental Brief involving challenges to NPS's denial of rulemaking petitions, the agency's decision was upheld. *See* Supp. Brief at 4. As such, the § 553(e) pathway to judicial review cannot "supply a basis for denying judicial review" here. *Id.*

9

Finally, the premise underlying Defendants' reliance on the APA petition process is itself flawed. As explained above and in the Complaint, the Aerial Delivery Rule does not regulate or prohibit BASE jumping in the national parks. By its plain text and regulatory history, the Rule governs aerial cargo operations and emergency deliveries—not recreational human flight. Indeed, NPS has never promulgated a regulation that actually addresses BASE jumping or its legality in the parks. There was thus never an applicable regulation for Plaintiffs to petition the agency to amend or repeal in the first place. Plaintiffs are not required to seek amendment of an inapplicable rule as a precondition to judicial review. Direct judicial review is thus not only appropriate, but the only meaningful avenue for resolving the legal questions presented here.

DATED: January 16, 2026                                  Respectfully submitted,

/s/ Casey Norman
Casey Norman
Litigation Counsel
New York Bar # 5772199
SDTX # 3845489
Casey.Norman@ncla.legal
Attorney-in-Charge

/s/ Kara Rollins
Kara Rollins*
Litigation Counsel
New York Bar # 5448147
Kara.Rollins@ncla.legal
* Pro Hac Vice

NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203

Telephone: (202) 869-5210

*Counsel for All Plaintiffs*


/s/ Adam Adler
Adam Adler*
New York Bar # 5470174
E-mail: aadler@reichmanjorgensen.com
* Pro Hac Vice

REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1909 K St., NW Suite 800
Washington, DC 20006
Telephone: (202) 894-7312

*Counsel for Plaintiff BASE Access*